[Cite as *State v. Ibrahim*, 2015-Ohio-3345.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 102114

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MAHMOUD S. IBRAHIM

DEFENDANT-APPELLANT

### JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-573051-A

**BEFORE:** McCormack, P.J., Stewart, J., and Boyle, J.

**RELEASED AND JOURNALIZED:** August 20, 2015

**ATTORNEY FOR APPELLANT**

David L. Doughten
David L. Doughten Co. L.P.A.
4403 St. Clair Avenue
Cleveland, OH 44103


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Jeffrey S. Schnatter
Assistant County Prosecutor
9th Floor, Justice Center
1200 Ontario Street
Cleveland, OH   44113

TIM McCORMACK, P.J.:

**{¶1}** Defendant-appellant, Mahmoud Ibrahim, was indicted for multiple counts of sex offenses that charged him with sexual abuse of his grandson. A jury found him guilty of all counts. On appeal, he argues the evidence was insufficient to find him guilty of the offenses as indicted because the time frame specified in the indictment was different from what the victim testified to at trial. He also argues the trial court erred in permitting a social worker to testify about her diagnosis and treatment of the victim for post-traumatic stress disorder. Additionally, he claims that his trial counsel provided constitutionally ineffective assistance and that his conviction was against the manifest weight of the evidence. After a careful review of the record and applicable law, we affirm Ibrahim's conviction.

**{¶2}** The child victim, I.S., was born in 2001. His parents were separated in 2004 and divorced in 2005. After his parents' separation, I.S., along with his two older brothers, lived with his mother, and his father lived with his own family in an extended household that included I.S.'s father's brother, the brother's wife, I.S.'s paternal grandfather (appellant Ibrahim), Ibrahim's wife, and several others. I.S., along with his two brothers, would visit their father every Sunday.

**{¶3}** I.S.'s father moved out of the shared home when I.S. was around eight and the visits to the home stopped. In February 2013, while I.S. and his mother were watching a TV show about child molestations, I.S. became emotional and revealed to his

mother he had been abused by his grandfather. A few weeks later after the revelation, I.S.'s mother went to the North Olmsted police to report the sexual abuse.

{¶4} The grand jury subsequently indicted Ibrahim on four counts of rape and three counts of kidnapping. The first, third, fourth, and sixth counts charged him with rape in violation of R.C. 2907.02(A)(1)(b); each count has a furthermore clause that the victim was less than ten years of age. The second, fifth, and seventh counts charged him with kidnapping with a sexual motivation specification. The matter went to a jury trial.

## Trial Testimony

{¶5} The state's key witness was the victim himself, 13 at the time of the trial. He testified that, on multiple occasions, when he was at his father's house, his grandfather, whom he called Cito, took him to a downstairs bathroom, pulled down his (I.S.'s) pants, and "put his pee-pee in my buttock."

{¶6} I.S. recalled the first such incident happened during the spring break of his kindergarten year. I.S. was 6 years old at the time. He was playing video games with his brothers in the downstairs family room. His grandfather came down to ask him if he needed to go to the bathroom. He said no, but his grandfather said "come on, let's just try." His grandfather picked him up, took him to the bathroom, had him stand on the toilet, pulled down his (I.S.'s) pants, and put his "private part in my butt." When finished, his grandfather pulled up his own pants and walked out. I.S. himself got off the toilet and washed his hands. He did not tell anyone because he thought "it was normal."

I.S. estimated they were in the bathroom for two minutes. I.S. also testified that, before this incident, his grandfather used to take showers with him.

{¶7} I.S. recalled a second incident in the summer before he started first grade. His grandfather again came downstairs to ask him if he needed to use the bathroom. He said no because he had just gone. His grandfather said "let's try" and took him to the bathroom. I.S. testified that on this occasion his grandfather positioned him standing on the toilet and facing the shower while he (his grandfather) knelt. In I.S.'s words, his grandfather "put his breath on my pee-pee" for about fifteen seconds.

{¶8} The third incident I.S. recalled happened in a morning before the winter break of his first grade. His grandfather again took him to the bathroom and put his private part in I.S.'s buttock. He remembered his grandfather went to get Dunkin' Donuts for the boys afterward. He also remembered seeing his father plowing the snow on the driveway that morning.

{¶9} The last incident of sexual abuse that I.S. recalled occurred around the time his father was moving out of the shared household. On that occasion, I.S.'s cousins came over for a religious holiday. When they were playing video games, his grandfather came downstairs and asked him if he needed to go to the bathroom. He said no and started to kick. His grandfather took him into the bathroom, pulled his (I.S.'s) pants down, and put his private part in I.S.'s buttock. I.S. testified that he told his mother about the sexual abuse in February 2013 when they were watching a TV show.

{¶10} I.S. gave varying information during the police investigation and at trial about the number of times and the period of time the sexual abuse occurred. He apparently told the police it occurred ten times, but on cross-examination he stated it happened every time he stayed at his father's household. He told the police the abuse started when he was eight, but he testified at trial that the first incident occurred when he was in kindergarten, when he was six or seven. On cross-examination, he stated the abuse took place "a couple of years" before he revealed the abuse to his mother, when his testimony on direct examination placed the abuse at an earlier period of time.

{¶11} In addition to I.S., other witnesses testifying for the state included I.S.'s mother, I.S.'s maternal grandmother, two police officers from the North Olmsted police department, a social worker from the county children services, and a social worker from The Nord Center.

{¶12} I.S.'s mother testified that I.S.'s father began residing at his family's extended household after the couple separated in 2004, when I.S. was three or four. I.S. and his brothers would spend weekends at his father's residence. In 2007, I.S. started kindergarten when he was six.

{¶13} I.S.'s mother testified that, one day in February, she and I.S. were watching a documentary on TV about a Red Sox coach molesting boys. She noticed I.S.'s face became flushed, and he started to rock back and forth. She paused the show and asked I.S. if something was bothering him. She told him if somebody did something to him, she would believe him. I.S. initially said nothing, but 20 minutes later, he told her that

"Cito" — referring to Ibrahim — put his (I.S.'s) penis in his ("Cito's") mouth. I.S.'s mother, sick to the stomach, asked him if he cried, if Cito told I.S. not to tell anyone, and if Cito did it to I.S.'s brothers. She then called I.S.'s father regarding the revelation. I.S.'s father came over the next day. He wanted I.S. to get help, but did not want anything to happen to his father because his father was in poor health. She went to the police a week later. She also took I.S. to The Nord Center for counseling.

{¶14} I.S.'s mother also testified that, toward the end of the time when I.S. went for the weekend visitation with his father, I.S. would cry, scream, hyperventilate, and become nauseous. When she inquired, however, I.S. would say nothing.

{¶15} The defense's theory was that I.S.'s mother concocted the story of sexual abuse because of the acrimonious divorce and custody battle. On cross-examination, I.S.'s mother acknowledged that she sent a text on February 12, 2013, to I.S.'s father asking him to give up custody of the children. The text said "we can do this the nice way or the ugly way." The text was sent two weeks before March 1, 2013, the day she went to the North Olmsted police department and reported the molestation. When confronted with her text message on cross-examination, I.S.'s mother explained that, by "the ugly way," she meant getting a lawyer involved.

{¶16} I.S.'s maternal grandmother testified that she remembered I.S. reacted negatively before going to his father's residence for visitations. He would cover his eyes and cry violently.

**{¶17}** Sergeant Eric Morgan of the North Olmsted police department testified that on March 1, 2013, I.S.'s mother came to the police station to report that her son had been molested. She told him they were watching a TV show about molestation and I.S. started to act funny and eventually told her about being molested by his grandfather. Sergeant Morgan asked I.S. how often it occurred when he visited his grandfather's residence, and I.S. said "every time." During the police interview, I.S. was crying and shaking, and his mother appeared to be stunned with the revelation.

**{¶18}** Detective Kenneth Vagase, a sex crime specialist of the North Olmsted police department, testified he was trained in dealing with child victims of sex offenses. He worked with social worker Rob Wilczewski of Lorain County Children and Family Services in this case. After I.S.'s mother made the report, Wilczewski interviewed I.S. while Detective Vagase observed the interview from a separate room. Detective Vagase and Wilczewski together conducted a second interview of I.S. During that interview, I.S. broke down and cried. Detective Vagase later obtained I.S.'s medical records from his pediatrician. Nothing from the medical records, however, indicated the existence of anal penetration. Detective Vagase testified that, in his experience, the further removed in time the medical exam was conducted from the abuse, the less likely the medical exam would yield any evidence of abuse.

**{¶19}** Wilczewski, who was trained in interviewing child victims of sexual abuse, testified that I.S. related that the abuse occurred when he was about seven or eight years old. I.S. told him his grandfather would separate him from other members of the family,

take him into the downstairs bathroom, pull his pants down, and anally penetrate him. I.S. recalled ten such instances. I.S. also recalled five instances where his grandfather performed oral sex on him.

{¶20} Wilczewski testified that there are three types of case dispositions his agency would make after an investigation of alleged abuse: "substantiated," "indicated," or "unsubstantiated." In this case, the disposition of the sexual abuse allegation after the initial interview of I.S. was that sexual abuse was "indicated." Wilczewski testified that during the second interview, where he and Detective Vagase were both present, I.S. was visibly emotional, crying when elaborating on what happened to him. Based on his assessment that I.S. exhibited indications of post traumatic stress disorder ("PTSD") because of the victimization, his agency referred I.S. for mental health counseling services. He testified that he did not believe other factors in I.S.'s home or school environment would have contributed to his exhibition of PTSD symptoms.

{¶21} Melissa Wheeler, an independent licensed social worker with a supervisory designation, was the supervisor for the child and adolescence services at The Nord Center. She testified that she treated I.S. for a diagnosis of PTSD from "reported past sexual abuse." She explained that the disorder described someone who witnessed or experienced a traumatic event that caused significant fear and hopelessness. Such a person would also exhibit symptoms of decreased or lack of ability to sleep, nightmares, flashbacks, attention issues, hypervigilance, and exaggerated startled responses. She testified that I.S. exhibited all these symptoms. I.S. eventually related to her that he was

having chronic visions of past sexual abuse. I.S. told her his grandfather "put his pee-pee in his butt" on several occasions when he was staying at his house. His grandfather would ask him if he needed to go to the bathroom when he was watching TV. I.S. would say no but on many occasions his grandfather would pick him up and take him into the bathroom and rape him. Initially, when I.S. talked about these events he would look like he had a panic attack — changing his positions from sitting to standing, or pacing; his breathing would increase; his face would turn flush; sometimes he would weep. In her understanding, the abuses occurred between the ages of five to nine. She testified that a delayed disclosure of abuse was not uncommon. In her experience, there was often no physical evidence of sexual assault years after the assault.

{¶22} Wheeler also testified that I.S. related to her he had nightmares of the sexual abuse occurring again and, in those nightmares, his grandfather tried to kill him or was telling him to kill himself. Wheeler treated I.S. by applying a trauma-focused cognitive behavioral therapy model. I.S. responded well to the therapy and made huge process. The approaching trial, however, caused him significant anxiety.

{¶23} Wheeler was asked about factors in I.S.'s environment that could have caused his emotional issues, such as the abuse of his mother by her boyfriend, the drug use by his mother and her boyfriend, his mother's mental health, or the problems he was experiencing at school. Wheeler stated that these issues were not presented by I.S. as most troubling to him in the therapy sessions.

**Defense**

{¶24} The defense's theory was that the sexual abuse allegation was spawned from a bitter divorce and custody battle between I.S.'s parents. Much of the testimony presented by the defense pertained to the troublesome relationship of the parents.

{¶25} I.S.'s father's second wife testified that after she and I.S.'s father married in April 2007, they lived in a shared household with I.S.'s father's family until November 2008. There were eight adults living in the home. She testified to the strife between her husband and I.S.'s mother; on one occasion, I.S.'s mother showed up at the door past midnight with a knife. She described Ibrahim as loving and caring, someone whom everybody gravitated toward. She never saw or heard any suspicious activities.

{¶26} I.S.'s father testified to the rocky relationship between I.S.'s mother and him and that children's services had been called on several occasions regarding their children. In addition, he testified there was little privacy in the shared home because there were eight adults residing there. He also testified that his father managed a social club, working seven days a week and often coming home very late. He learned about the accusation of sexual abuse two weeks before his ex-wife went to the police.

{¶27} After trial, the jury found Ibrahim guilty of all seven counts. The trial court merged the kidnapping counts with the rape counts. For each rape count, the court imposed a concurrent term of life with parole eligibility after 15 years.

{¶28} On appeal, Ibrahim raises four assignments of error for our review. We address them in the order presented.

1. The evidence is insufficient to establish the appellant's guilty [sic] within the time frame found by the grand jury.

2. The trial court erred by allowing a witness to testify as to matters irrelevant to the issue of guilt or non-guilt.

3. Defense counsel's failure to object to unfairly prejudicial evidence deprived the appellant of his right to the effective assistance of counsel.

4. The verdicts are against the weight of the evidence.

## Sufficiency of Evidence

{¶29} Under the first assignment of error, Ibrahim claims that the state failed to produce sufficient evidence to prove that the unlawful sexual conduct occurred within the time frame stated in the indictment.

{¶30} When reviewing a challenge to the sufficiency of evidence, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶31} Ibrahim claims the state failed to present sufficient evidence to prove he committed the offenses during the time frame specified in the indictment. Ibrahim points us to the discrepancy between the time frame stated in the indictment and I.S.'s testimony: the indictment charged him with four counts of rape occurring between July 2009 and

November 2009, but the child's testimony showed that the first three incidents occurred in the spring of his kindergarten year, which would make it 2008 instead of 2009.[1]

{¶32} "Where the exact date and time of an offense are not material elements of a crime nor essential to the validity of a conviction, the failure to prove such is of no consequence and it is sufficient to prove that the alleged offense occurred at or about the time charged." *State v. Madden*, 15 Ohio App.3d 130, 131, 472 N.E.2d 1126 (12th Dist.1984), citing *Tesca v. State*, 108 Ohio St. 287, 140 N.E. 629 (1923), and *State v. Dingus*, 26 Ohio App.2d 131, 269 N.E.2d 923 (4th Dist.1970). The precise date of a rape is not an essential element of the crime. *State v. Sellards*, 17 Ohio St.3d 169, 171, 478 N.E.2d 781 (1985).

{¶33} An indictment charging sexual offenses against children need not state with specificity the dates of alleged abuse; some latitude and inexactitude is allowed with respect to the timing of these offenses. *State v. Gilfillan*, 10th Dist. Franklin No. 08AP-317, 2009-Ohio-1104, ¶ 43. This is because many young victims are simply unable to remember the dates, particularly when the repeated offenses take place over an extended period of time. *State v. Yaacov*, 8th Dist. Cuyahoga No. 86674, 2006-Ohio-5321, ¶ 17; *State v. Triplett*, 11th Dist. Ashtabula No. 2013-A-0018, 2013-Ohio-5190, ¶ 44. "'The problem is compounded where the accused and the victim

---

[1] The record reflects that, at the close of the state's case, the state moved the trial court to exercise its authority under Crim.R. 7(D) to amend the indictment regarding the time frame so as to conform the indictment to the victim's testimony. After an objection from the defense, the trial court denied the state's request.

are related or reside in the same household, situations which often facilitate an extended period of abuse.'" *Yaccov* at ¶ 17, quoting *State v. Robinette* , 5th Dist. Morrow No. CA-652, 1987 Ohio App. LEXIS 5996, *8 (Feb. 27, 1987).

**{¶34}** Here, the indictment charged Ibrahim with four counts of rape occurring between July 2009 and November 2009. I.S. testified to four specific rapes, but his testimony placed the first rape in the spring of his kindergarten year (2008), the second in the summer after kindergarten (2008), the third in the wintertime in his first grade (2008), and the fourth around the time when his father was moving out of the shared house.[2] Social worker Wilczewski testified I.S. related to him the abuse occurred when he was about seven or eight years old, which would place the rapes in 2008 and 2009. I.S.'s counselor, Wheeler, testified I.S. told her the abuse occurred when he was about five to nine years old.

**{¶35}** Ibrahim was charged with rape as defined in R.C. 2907.02(A)(1)(b). R.C. 2907.02(A)(1) states: "No person shall engage in sexual conduct with another * * * when * * * (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person." The evidence presented by the state in this case, if believed, establishes the elements of rape defined in R.C. 2907.02(A)(1)(b). The inexactness in time does not render the evidence insufficient for a violation of R.C. 2907.02(A)(1)(b) or for the furthermore "under ten" specification, because the victim,

---

[2] It is unclear from the testimony when this incident occurred — I.S. stated he stopped going to his father's house when he was eight, thus placing the year in 2009, while I.S.'s father's new wife placed their moving from the house in November 2008.

born in 2001, was under ten, whether the sexual abuse occurred in 2008 or 2009. The inexactness was not detrimental to his defense because he maintained at trial that the sexual abuse never occurred. The first assignment of error is without merit.

**Testimony of the Diagnosis and Treatment of PTSD**

**{¶36}** Under the second assignment of error, Ibrahim argues the trial court erred in allowing I.S.'s counselor Wheeler to testify about I.S.'s diagnosis and treatment of PTSD. He contends Wheeler was not qualified to make the diagnosis. He also claims the PTSD evidence is victim impact evidence and, as such, not admissible as evidence of guilt.

**{¶37}** Because Ibrahim's trial counsel did not object to Wheeler's testimony, we apply a plain error analysis. Plain error exists only if the outcome of the trial clearly would have been otherwise but for the error. *State v. Harrison*, 122 Ohio St.3d 512, 2009-Ohio-3547, 912 N.E.2d 1106, ¶ 61. Notice of plain error is to be taken "'under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Id.*, quoting *State v. Long*, 53 Ohio St.2d 91, 95, 372 N.E.2d 804 (1978).

**{¶38}** Ibrahim argues Wheeler's testimony regarding her diagnosis and treatment was a violation of *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In *Crawford*, the United States Supreme Court held that an admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is "testimonial," unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness.

**{¶39}** Wheeler, an independent licensed social worker with a supervisory designation, testified that she supervised five social workers and she counseled youths for a range of emotional disorders. As an independent licensed social worker, she had completed a master's degree and received two years of supervision under an independently licensed professional. She also takes 30 continuing educational hours every two years. Pursuant to R.C. 4757.26(A),[3] an independent licensed social worker such as Wheeler may diagnose and treat mental and emotional disorders. *See Bruce*, 8th Dist. Cuyahoga No. 92016, 2009-Ohio-6214, at ¶ 86 (a social worker who held a masters degree in social work and worked in the field of mental health for many years was qualified to make a mental health diagnosis and testified that the victims suffered from PTSD).

**{¶40}** Ibrahim argues that Wheeler's testimony was a violation of *Crawford* because she was testifying about someone else's diagnosis. This claim is without merit. Wheeler testified that she counseled youths for depression, trauma, adjustment disorders, and anxiety. She used cognitive, trauma-focused, or dialectical behavioral therapy to treat the patients. At the time of trial, Wheeler had been treating I.S. for a year for "reported past sexual abuse." After explaining how PTSD was generally diagnosed, Wheeler testified that I.S. exhibited all of the symptoms, including inability to sleep,

---

[3]R.C. 4757.26(A) states: "A person licensed under this chapter to practice as an independent social worker or a social worker may diagnose and treat mental and emotional disorders, except that a social worker may do so only under the supervision of a psychologist, psychiatrist, licensed professional clinical counselor, independent marriage and family therapist, independent social worker, or registered nurse who holds a master's degree in psychiatric nursing."

nightmares, flashbacks, attention disorder, hypervigilance, and exaggerated startled responses. Because Wheeler provided testimony of her own diagnosis and treatment of I.S. for psychological trauma for past sexual abuse reported by I.S., *Crawford* has no application here.

{¶41} Ibrahim also claims Wheeler's testimony constituted victim impact evidence and argues that such victim impact evidence was inadmissible at the guilt phase of the trial.

{¶42} Under R.C. 2930.13 and 2947.051, prior to imposing a sentence, a trial court may order and consider a victim impact statement as prepared by the probation department or a victim assistance program, in which the victim may make a statement regarding the physical or emotional harm he or she suffered from the crime. The victim impact statement could also include the psychological impact experienced by the victim's family. Wheeler's testimony about her diagnosis and treatment of I.S. for PTSD is not victim impact evidence as defined by the statute.[4] Wheeler's testimony was admissible. There

---

[4] Ibrahim cites several cases in his brief in support of his claim. None of them are pertinent to the present case. In *State v. White*, 15 Ohio St.2d 146, 239 N.E.2d 65 (1968), the appellant sentenced to death for murder argued the prosecutor improperly used the victim's background in arguing for the death penalty. The court determined that such evidence was improper but nothing on the record indicated the three-judge panel was prejudiced by such evidence. In *State v. Fautenberry*, 72 Ohio St.3d 435, 650 N.E.2d 878 (1995), another capital case, the victim's family described the impact of the victim's death on them and also stated their desire to have the defendant sentenced to death. The court held that the statements describing the impact of the victim's murder on his family fell within the allowable victim impact evidence but the admission of the family's recommendation of death penalty was erroneous; the court, however, did not find the error reversible. As part of its analysis, the *Fautenberry* court clarified its past decision in *State v. Loza*, 71 Ohio St.3d 61, 641 N.E.2d 1082 (1994). In *Loza*, the prosecutor made the comment at the penalty stage of the proceedings that one of the murdered victims was pregnant. The defendant Loza argued that

was no error, plain or otherwise, committed by the trial court in allowing her to testify.

The second assignment of error is overruled.

---

this statement was impermissible victim impact evidence. The court in *Fautenberry* clarified its analysis in *Loza* and explained that the evidence of the victim's pregnancy related to the facts attendant to the commission of the offense and was clearly admissible during the guilt phase. The *Fautenberry* court held that evidence that depicted both the circumstances surrounding the crime and also the impact of the crime on the family would be admissible during both the guilt and sentencing phases. These cases cited by Ibrahim delineated the scope of permissible victim impact statements. They have nothing to do with the instant case, where a mental health professional testified about her diagnosis and treatment of the victim's emotional trauma.

## Ineffective Assistance of Counsel

**{¶43}** Under the third assignment of error, Ibrahim argues his trial counsel provided ineffective assistance of counsel. In order to establish a claim of ineffective assistance of counsel, appellant must prove (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In Ohio, every properly licensed attorney is presumed to be competent and, therefore, a defendant claiming ineffective assistance of counsel bears the burden of proof. *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Counsel's performance will not be deemed ineffective unless and until the performance is proven to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. *State v. Iacona*, 93 Ohio St.3d 83, 105, 752 N.E.2d 937 (2001). Decisions on strategy and trial tactics are generally granted wide latitude of professional judgment, and it is not the duty of a reviewing court to analyze the trial counsel's legal tactics and maneuvers. *State v. Gau*, 11th Dist. Ashtabula No. 2005-A-0082, 2006-Ohio-6531, ¶ 35.

**{¶44}** Ibrahim claims his trial court provided ineffective assistance of counsel in not objecting to social workers Wheeler's and Wilczewski's testimony. He also claims his trial counsel should have impeached I.S.'s mother's credibility by cross-examining her about a physical examination of I.S. that she alleged was conducted but actually never occurred.

**{¶45}** We have already addressed Wheeler's testimony in the foregoing. Regarding the testimony of Wilczewski, a social worker from the county children services, Ibrahim claims Wilczewski improperly testified that the case was considered "substantiated" by the agency.

**{¶46}** Ibrahim misrepresents the record. Wilczewski testified that there are three types of case depositions his agency would make after an allegation of abuse: "substantiated," where the agency had conclusive proof of abuse, "indicated," where there were some suspicions or concerns based on the statements of witnesses or the child victim, or "unsubstantiated." Wilczewski testified that the agency's disposition in this case was that the sexual abuse was "indicated." A social worker's testimony that the allegation of sexual abuse is determined to be "indicated" by the children services is admissible, because the agency's disposition is not considered testimony regarding veracity. *State v. Whitfield*, 8th Dist. Cuyahoga No. 89570, 2008-Ohio-1090, ¶ 19, citing *State v. Smelcer*, 89 Ohio App.3d 115, 623 N.E.2d 1219 (8th Dist.1993). *See also State v. Jackson*, 8th Dist. Cuyahoga No. 92531, 2010-Ohio-3080, ¶ 17.

**{¶47}** Ibrahim also claims his trial counsel provided ineffective assistance in failing to cross-examine I.S.'s mother regarding a physical examination of I.S. she alleged to have taken place but in fact never occurred. Again, this claim misrepresents the record.

**{¶48}** Our review of the trial transcript reflects that I.S.'s mother testified that she and her son were interviewed separately after her report of sexual abuse and she believed her son also had a physical examination. After she alluded to the physical examination in

her testimony, the trial court immediately conducted a hearing outside the jury's presence. At this hearing, she explained that she and her son met at The Nord Center and were interviewed by the detectives separately, and then a physical examination of her son was conducted. She was not present at the physical examination and was only told that they were going to position I.S. in different physical positions to look for evidence of anal penetration in his rectum. Under questioning by the defense, she stated that she was told about the conclusion drawn from the physical examination but was not given a written report.

{¶49} Apparently, neither the prosecutor nor the defense was aware of such a physical examination. When I.S.'s mother resumed testifying before the jury, no further questions were asked regarding the physical examination. Later in the day, again outside of the jury's presence, the trial court learned that the prosecutor just received a report from The Nord Center regarding the physical examination alluded to and the report was immediately turned over to the defense. The report apparently included some statements from I.S.'s mother that were somewhat inconsistent with I.S.'s account of the abuse. The defense counsel asked the trial court for permission to use those statements to impeach I.S.'s mother. The trial court denied the request. Based on this record, we do not find deficient representation as claimed by appellant.

## Manifest Weight

{¶50} A manifest-weight claim requires the appellate court to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, citing *Martin* at 175. When examining witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986).

{¶51} Although I.S. was unable to give specific dates for the sexual abuse and the information he gave to the police and social workers regarding the time period and how often the abuse occurred varied somewhat from his testimony at trial, he provided testimony for four specific incidents — one in the spring of his kindergarten year, one in the summer of that year, one in the winter of his first grade, and the last one when his father was moving out. He was able to recall certain detail about each occasion. The defense claimed the allegation was fabricated and spawned from a bitter custody battle; it presented testimony from I.S.'s father and his new wife in support of its theory.

Credibility is within the province of the jury. When presented with conflicting testimony, the jury, as the trier of fact, is free to believe all, part, or none of any witness's testimony. "'[A] conviction is not against the manifest weight of the evidence simply because the jury rejected the defendant's version of the facts and believed the testimony presented by the state.'" *State v. Jallah*, 8th Dist. Cuyahoga No. 101773, 2015-Ohio-1950, ¶ 71, quoting *State v. Hall*, 4th Dist. Ross No. 13CA3391, 2014-Ohio-2959, ¶ 28. *See also State v. Brown*, 12th Dist. Butler No. CA2013-03-043, 2014-Ohio-1317, ¶ 20. The fifth assignment of error lacks merit.

{¶52} The judgment of the trial court is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, PRESIDING JUDGE

MELODY J. STEWART, J., and
MARY J. BOYLE, J., CONCUR