[Cite as *State v. Warner*, 2024-Ohio-1949.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230388 |
| | | TRIAL NO. B-2005821 |
| Plaintiff -Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| DAMON WARNER, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 22, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Alex Scott Havlin*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Angela J. Glaser*, for Defendant-Appellant.

**BOCK, Presiding Judge.**

{¶1}   A jury found defendant-appellant Damon Warner guilty of statutory rape following a trial in which Warner represented himself. At trial, the state alleged that Warner engaged in cunnilingus with H.J., the 12-year-old daughter of Warner's girlfriend. On appeal, Warner challenges his conviction on the weight and sufficiency of the evidence and argues that the trial court erred in admitting a recording of a forensic interview of H.J. at trial.

{¶2}   We hold that Warner's conviction was supported by sufficient evidence as H.J.'s testimony established each element of the crime. Further, Warner's conviction was not against the manifest weight of the evidence because H.J. consistently testified that Warner engaged in cunnilingus with H.J., and a review of the entire record shows that there was no reason to believe the jury lost its way in believing H.J.'s testimony over Warner's. Finally, because Warner did not object to the admission of the video of the forensic interview, we review for plain error, and we find none in the trial court's decision to admit the video.

## I.    Facts and Procedure

### A. Procedural History

{¶3}   Warner was indicted in December 2020 on a single count of statutory rape in violation of R.C. 2907.02(A)(1)(b). The court appointed an attorney to represent Warner. In October 2022, Warner's attorney moved to withdraw citing irreconcilable differences. The trial court granted the motion and appointed new counsel. In March 2023, Warner requested to have his second attorney withdraw and sought to represent himself. The court granted Warner's motion and appointed standby counsel. The trial court reviewed at length Warner's right to counsel and the

2

various benefits a trial attorney would provide Warner that he was waiving by representing himself. Warner acknowledged that he may lose an appeal because he did not make proper objections at trial. Warner signed a written waiver of counsel.

{¶4}     Warner's two-day jury trial began in June 2023.

## B. The trial

{¶5}     In 2020, Warner lived with his girlfriend ("Y.J.") in Hamilton County along with Y.J.'s two adult sons and two daughters, 12-year-old H.J. and 18-year-old F.J. Warner and Y.J. had been dating for around seven years and Warner stayed at home to take care of H.J. and F.J. while Y.J. and her sons were at work.

*State's witnesses testified about the allegations*

{¶6}     In July 2020, F.J. texted Y.J., stating that F.J. needed to speak with her. When Y.J. returned home from work, F.J. revealed that Warner and F.J. had been consensually "intimate." As F.J. was disclosing to her mother her relationship with Warner, H.J. came into the room and said, "[Y]eah, that's what happened to me." Y.J. testified that H.J. told her that Warner "was putting his tongue—I guess he was giving her oral sex." Y.J. clarified that she understood this to mean that Warner was putting his mouth on H.J.'s vagina.

{¶7}     H.J. was 15 years old at the time of the trial and testified against Warner. H.J. testified that while in her mother's bed, Warner "put[] his tongue in [her] vagina." H.J. could not remember how many times this happened but stated it "happened a lot," it began when she was "probably 10," and one of these events occurred in July 2020. H.J. confirmed that she was not the spouse of Warner. H.J. stated that she did not tell anyone about what Warner did because she was scared and because Warner had a gun. H.J. could not remember if Warner ever told her not to tell anyone about

3

what he was doing to her. She decided to tell Y.J. that Warner had raped her because she overheard F.J.'s disclosure. H.J. testified that she was telling the truth and that no one told her to fabricate her story against Warner.

{¶8} After H.J. made her disclosure, Y.J. called the police. She, H.J., and F.J., went to the police station where Detective Brandon Goff briefly interviewed H.J. After Goff determined that H.J. had made a disclosure of sexual abuse, he stopped his interview with her and scheduled a forensic interview at the Mayerson Center for Safe and Healthy Children at Cincinnati Children's Hospital ("Mayerson").

{¶9} Y.J. consented for the police to search H.J.'s phone. Goff testified that he located a video sent by Warner to H.J.'s phone in which Warner and F.J. were having sex. After this line of questioning began, the trial court stopped the proceedings and brought the parties into chambers, stating that it was concerned about the discussion of the video. The prosecutor stated that she did not intend to play the video for the jury but argued the video was relevant as corroborating "the pattern of abuse described by the victim." When asked if he had anything for the record, Warner stated he was "pretty inexperienced at this" and did not know "what to object to" but suggested that the video was relevant to disproving a claim that F.J. had previously made that Warner sexually assaulted her. The trial court determined that the video was overly prejudicial and off-topic and instructed the state to move on.

*Trial court admitted social worker's interview with H.J.*

{¶10} Emily Harman is a social worker and forensic interviewer with Mayerson and interviewed H.J. in early August 2020. Harman testified that she worked as part of a "multidisciplinary team of different professionals" who evaluate, diagnose, and treat child abuse and neglect. Harman stated that she also worked

4

closely with law enforcement and child protective services caseworkers. Harman stated that her role as a forensic interviewer is to gather information from children "for the purpose of providing medical care" and that she consults with physicians following every interview to determine if the physicians have any recommendations for further medical, psychological, or therapeutic care. Harman stated that following H.J.'s interview, Harman consulted with physicians, offered a medical exam to H.J., and forwarded her report to law enforcement.

{¶11} The state played a recording of the forensic interview for the jury, to which Warner did not object. In the interview, H.J. stated that Warner had touched her "private part" with his mouth. H.J. clarified that her private part was the thing she "used to pee." H.J. stated that Warner's abuse started when she was nine years old, occurred multiple times, and continued into the summer when she was 12 years old. H.J. said that the abuse occurred when her mom was at work and that no one was ever in the room or saw the abuse happen. H.J. described the abuse happening in Warner's bedroom. H.J. also talked about the video that Warner sent to her phone of Warner and F.J. having sex.

{¶12} Following the close of the state's case, Warner moved for a judgment of acquittal, which the trial court denied. Warner then testified in his defense. Warner denied molesting H.J. and denied ever owning a gun. Warner stated that he had a consensual relationship with F.J. Warner attempted to talk about the video he sent to H.J., stating that he had sent it by accident. The state objected, and the trial court struck all testimony about the video and instructed the jury not to consider the video or the testimony about the video. Warner then rested.

5

**{¶13}** The jury found Warner guilty and the trial court sentenced him to a term of eight-to-12 years in prison. Warner now appeals.

## II. Law and Analysis

### A. Warner's conviction was supported by sufficient evidence

**{¶14}** In his first assignment of error, Warner argues that his conviction was based on insufficient evidence. A sufficiency-of-the-evidence challenge "tests 'the adequacy of the evidence on each element of the offense.' " *State v. Wright*, 1st Dist. Hamilton No. C-220578, 2024-Ohio-851, ¶ 25, quoting *State v. Staley*, 1st Dist. Hamilton Nos. C-200270, C-200271 and C-200272, 2021-Ohio-3086, ¶ 9. This court, viewing the evidence in a light most favorable to the state, determines whether a reasonable fact finder could have found that the state proved beyond a reasonable doubt all the essential elements of the offense. *State v. Kendrick*, 1st Dist. Hamilton No. C-220459, 2023-Ohio-1763, ¶ 15, citing *State v. MacDonald*, 1st Dist. Hamilton No. C-180310, 2019-Ohio-3595, ¶ 12. This court does not weigh the evidence and when faced with evidence subject to more than one possible interpretation, we adopt an interpretation of the evidence consistent with the trial court's judgment. *Id.*

**{¶15}** To convict Warner for rape under R.C. 2907.02(A)(1)(b), the state needed to prove beyond a reasonable doubt that Warner (1) engaged in sexual conduct with H.J., (2) who was not his spouse, and (3) that H.J. was less than 13 years old. As relevant here, "sexual conduct" includes "cunnilingus." R.C. 2907.01(A). Warner performed cunnilingus on H.J. if he placed his mouth on her genitals. *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 86.

**{¶16}** The state presented sufficient evidence to support Warner's statutory rape conviction. H.J. testified at trial and stated in her Mayerson interview that

6

Warner had touched her genitals with his mouth when she was 12 years old. Warner was not H.J.'s spouse. H.J. testified at trial that Warner's abuse began when she was ten years old and continued until she was 12 years old in July 2020, when she made her disclosure to her mother.

{¶17} This court recently held that an alleged child-victim's testimony establishing the elements of rape under R.C. 2907.02(A)(1)(b) is sufficient evidence to support a rape conviction. *Wright*, 1st Dist. Hamilton No. C-220578, 2024-Ohio-851, at ¶ 27. A rational fact finder could have found that H.J.'s testimony established each element of rape. Accordingly, we overrule Warner's first assignment of error.

## B. Warner's conviction was not contrary to the manifest weight of the evidence

{¶18} In his second assignment of error, Warner asserts that his conviction was against the manifest weight of the evidence. A manifest-weight-of-the-evidence challenge argues that the state did not carry its burden of persuasion at trial. *Kendrick*, 1st Dist. Hamilton No. C-220459, 2023-Ohio-1763, at ¶ 16. In reviewing a conviction under this standard, an appellate court sits "as a 'thirteenth juror' " and must "independently 'review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.' " *State v. Kizilkaya*, 1st Dist. Hamilton Nos. C-230017 and C-230018, 2023-Ohio-3989, ¶ 15, quoting *State v. Powell*, 1st Dist. Hamilton No. C-190508, 2020-Ohio-4283, ¶ 16. Courts must use caution and order a new trial only in "exceptional case[s]" where the evidence heavily weighs against conviction. *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 77.

{¶19} Arguing that his conviction was against the manifest weight of the evidence, Warner points out that there was no physical evidence to support his

7

conviction. He also argues that H.J.'s testimony was vague and that she was unable to remember the actual month of the rape until the prosecutor asked a series of leading questions to elicit the date.

{¶20} "As a general rule, 'a lack of physical evidence, standing alone, does not render a defendant's conviction against the manifest weight of the evidence,' " and a conviction can be based solely on the testimony of the victim. *Wright*, 1st Dist. Hamilton No. C-220578, 2024-Ohio-851, at ¶ 32, quoting *State v. Mitchell*, 1st Dist. Hamilton No. C-210675, 2022-Ohio-3713, ¶ 17. While Warner argues that the state's case centered on H.J.'s credibility, "this court has repeatedly recognized that witness credibility is a matter for the trier of fact, who 'is in the best position to judge the credibility of the witnesses and the weight to be given to the evidence presented.' " *Mitchell* at ¶ 17, quoting *State v. Carson*, 1st Dist. Hamilton No. C-180336, 2019-Ohio-4550, ¶ 16. Considering all the evidence, including H.J.'s and Warner's conflicting testimony, there is nothing to indicate that the jury lost its way in believing H.J. instead of Warner.

{¶21} Warner does not specifically point to any evidence suggesting that H.J. was not credible beyond the issue of when the rape allegedly occurred. Initially, both H.J. and Y.J. testified that at least one instance of rape occurred in July 2020. Though both did so in response to leading questions, Warner did not object to the form of the questions and there was evidence that the abuse occurred in July 2020. Further, courts have "allowed 'a certain degree of inexactitude' in the averment of the date of a sexual offense involving a child when the date is not material to the case." *State v. Baxley*, 1st Dist. Hamilton No. C-970539, 1998 Ohio App. LEXIS 2997, 4 (July 2, 1998). "This is because many young victims are simply unable to remember the dates, particularly

when the repeated offenses take place over an extended period of time." *State v. Ibrahim*, 8th Dist. Cuyahoga No. 102114, 2015-Ohio-3345, ¶ 33.

{¶22} H.J.'s testimony and her Mayerson interview were consistent in stating that Warner touched H.J.'s genitals with his mouth multiple times, all of which occurred before she turned 13 years old. Warner's defense at trial was that the abuse never occurred. Any possible imprecision of the date of the abuse was therefore not detrimental to his defense. *See id.* at ¶ 35 ("The inexactness was not detrimental to his defense because he maintained at trial that the sexual abuse never occurred.").

{¶23} Warner also asserts in both his sufficiency and manifest-weight arguments that the trial court prevented him from presenting his theory of defense— "that H.J. fabricated the allegations against him after she overheard her sister was 'sexually assaulted' when in fact [F.J.] was never assaulted"—by preventing him from discussing the video Warner sent to H.J.'s phone. Warner asserts that he was denied his right to present his own trial strategy and therefore was denied a fair trial. But Warner did not assign as error the trial court's exclusion of the video or its restriction on his statements regarding the video. Therefore, any claimed evidentiary error involving the video is not before the court.

{¶24} We hold that Warner's conviction was not contrary to the manifest weight of the evidence and we overrule Warner's second assignment of error.

C. **Admitting the video of the victim's Mayerson interview at trial was not plain error**

{¶25} In his third assignment of error, Warner argues that the trial court erred in allowing the state to introduce the video of H.J.'s Mayerson interview at trial. Warner asserts that the primary purpose of H.J.'s statements during her forensic

interview was to gather evidence for a criminal conviction and not for medical diagnosis or treatment under Evid.R. 803(4).

{¶26} As Warner acknowledges, he did not object to the admission of H.J.'s Mayerson interview footage and this court can reverse only for plain error. *See State v. Lukacs*, 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, ¶ 34 (1st Dist.); *see also* Crim.R. 52(B). Accordingly, Warner must show that the admission of the Mayerson interview was an "obvious" error affecting his substantial rights, "meaning it 'affected the outcome of the trial.' " *State v. Sowders*, 1st Dist. Hamilton No. C-230153, 2023-Ohio-4498, ¶ 11, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). An appellate court reverses on plain error "only 'under exceptional circumstances and only to prevent a miscarriage of justice.' " *Sowders* at ¶ 11, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶27} Initially, Warner makes arguments referencing the Confrontation Clause and the "primary purpose" of H.J.'s statements. To the extent that Warner is arguing that the admission of H.J.'s video violated the Confrontation Clause of the Sixth Amendment, this argument fails as H.J. testified at trial. *See State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 64 ("The admission of hearsay does not violate the Confrontation Clause if the declarant testifies at trial.").

{¶28} A trial court's admission of statements may be improper if they are hearsay not within an exception. Evid.R. 802. "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are

excluded from the rule against hearsay and admissible. Evid.R. 803(4). This exception is based on the assumption "that a person will be truthful about his physical condition to a physician because of the risk of harmful treatment resulting from untruthful statements." 2006 Staff Notes to Evid.R. 803; *see State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 39. The Supreme Court of Ohio has recognized a secondary rationale for this rule, "the professional reliance factor," which provides that a statement that is "reasonably pertinent to medical diagnosis and treatment" and upon which a physician relied in reaching a diagnosis can meet this hearsay exception. *Muttart* at ¶ 41.

{¶29} The trial court retains discretion to exclude a statement falling under this hearsay exception and in doing so, should consider "the circumstances surrounding a child victim's statement." *Id.* at ¶ 47-49; *see State v. Dever*, 64 Ohio St.3d 401, 410, 596 N.E.2d 436 (1992). Courts should consider a list of nonexhaustive factors to determine the child's purpose in making the statement: (1) whether the interviewer used leading or suggestive questions; (2) signs that someone coached the child or the existence of a motive to lie or fabricate; (3) whether the child understood the need to tell the truth to medical professionals; (4) whether the declarant is young enough to lack an ability to fabricate or lie; and (5) the consistency of the child's statements. *Lukacs* at ¶ 7, citing *Muttart* at ¶ 49.

{¶30} In *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, the Supreme Court of Ohio held that a child-victim's statements to a forensic interviewer stating (1) that the defendant locked a door before raping her, (2) the location of other members of the victim's family, (3) information about the defendant's or the victim's clothes, and (4) the appearance of the defendant's penis were primarily

for forensic purposes and were not statements made for medical diagnosis and treatment. *Id.* at ¶ 34. The court held, however, that statements describing the acts performed by a defendant on a child victim were necessary for medical diagnosis and treatment, noting that a nurse practitioner testified that this information helped her assess whether further treatment was necessary. *Id.* at ¶ 38-39.

{¶31} Applying the *Muttart* factors, most of the statements H.J. made during the Mayerson interview fell within the hearsay exception. First, the interviewer did not use leading or overly suggestive questions. Second, while Warner suggested at trial that H.J. and F.J. had fabricated H.J.'s allegations, his argument was poorly developed and there was no real indication in the interview that H.J. had been coached. Third, the circumstances show that H.J. understood the need to tell the truth. Harman introduced herself as "Emily" and said her job was "just to talk to people." Harman told H.J. that, if H.J. heard Harman say something incorrect, H.J. should tell Harman so she could "fix it." Harman told H.J. that the purpose of their discussion was to make sure H.J. was safe and her "body is healthy." Near the end of the interview, Harman expressly told H.J. that she would relay her statements about "what body parts touched each other" to a doctor. Fourth, H.J.'s age—12 at the time of the interview—indicates an ability to fabricate or lie. And fifth, H.J.'s statements describing Warner's abuse were consistent. Overall, these factors suggest that the purpose of the interview and most statements was medical diagnosis and treatment.

{¶32} The trial court permitted the state to play H.J.'s entire Mayerson interview. And as Warner argues, not all of H.J.'s statements in her interview were made for medical diagnosis and treatment. The preliminary discussions were to build trust between H.J. and Harman and were not for the purpose of medical diagnosis and

12

treatment. Additionally, like in *Arnold*, H.J.'s statements about the location of the assault and where other members of her family were during Warner's abuse were not for medical purposes. And H.J. additionally talked about Warner directing her to take her clothes off. These statements "likely were not necessary for medical diagnosis or treatment." *See Arnold* at ¶ 34. But Warner failed to object to any portion of the Mayerson interview and the trial court's admission of these statements does not constitute plain error.

{¶33} We overrule Warner's third assignment of error.

### III.   Conclusion

{¶34} For the foregoing reasons, we overrule Warner's assignments of error and affirm the trial court's judgment.

Judgment affirmed.

**ZAYAS** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.